IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BENJAMIN KOENIG, <br>     Plaintiff <br><br> V. <br><br> JEROME A. BEEKMANS, <br> ANTHONY BEEKMANS, and <br> ZED GROUP (AUST) PTY LTD, AS <br> TRUSTEE FOR THE ZED GROUP <br> (AUST) UNIT TRUST, <br>     Defendants | § § § § § § § § § § § § § | CASE NO. 5:15-CV-0822-OLG <br><br><br> JURY DEMANDED |

## **AFFIDAVIT OF DAVID ALTMAN, M.D., C.L.C.P.**

STATE OF TEXAS
COUNTY OF BEXAR

    BEFORE ME, the undersigned authority on this day personally appeared David Altman, M.D., C.L.C.P., known to me to be a credible person over the age of 18 years, who being by me first duly sworn, did depose and say that the following is true and correct:

1.    My name is David Altman, M.D., C.L.C.P. I am over the age of eighteen (18) and am competent to testify. I have been retained by the Plaintiff in this lawsuit to render opinions regarding the probable cost of medical, health and attendant care goods and services that Plaintiff Benjamin Koenig will need in the future as a result of the injuries he sustained in an automobile collision that occurred on October 2, 2013. The facts to which I testify herein are within my personal knowledge or, if they are facts provided to me, are of the type reasonably relied upon by experts in my filed in formulating opinions such as those that I state herein. I swear under penalty of perjury that my testimony in this affidavit is true.

2.    The original life care cost analysis in this case, dated September 12, 2016, was prepared by myself and Dan Bagwell. A true and correct copy of that original life care cost analysis is attached hereto as Exhibit 1. I have reviewed that original life care analysis and agree that it was accurate at the time it was generated.

3.    Mr. Bagwell and I will be preparing a supplemental life care cost analysis, a true and correct copy of that supplemental life care cost analysis will be provided to all parties upon completion.

4    I am qualified to render an opinion regarding the medical, health and attendant care goods and services that Benjamin Koenig will need in the future, including the anterior lumbar interbody fusion/posterolateral lumbar fusion, pain management services and a fusion extension procedure

EXHIBIT "1"

within 20 years of the initial lumbar fusion that was included in the life care cost analysis. Benjamin Koenig will need these services to treat injuries and conditions resulting from the October 2, 2013 collision. A true and correct copy of my CV is attached hereto as Exhibit 2. Everything on that CV is true, and I adopted it as my testimony under oath in this affidavit.

5.  I am a medical doctor board certified neurologist with experience as the medical director of a rehabilitation hospital. I have extensive experience treating patients with injuries and conditions similar to those from which Benjamin Koenig suffers as a result of the collision, including vertebral fractures, herniated and protruding discs, and chronic back pain, including lower back pain with radiation into the lower extremities. As part of treating such patients, I apply my medical knowledge and training to the information presented by the patient to determine the cause of the patient's condition and determine what medial, attendant and health care goods and services the patient requires in light of the injuries or conditions with which the patient presents.

6.  Through my medical education, training and experience, I have acquired specialized knowledge about (i) the properties of the human anatomy (including the spine and nervous system), (ii) the causes of injuries to the back and spine, including trauma and degeneration, (iii) the various modalities of treatment available to treat injuries to and conditions of the spine and the consequences of such injuries (such as back pain, including pain radiating into the extremities), including the various methods of pain management (including medication, steroid and other injections, medial branch blocks, physical therapy, neurostimulation and radiofrequency neuroablation and the various types of back surgery (including anterior lumbar interbody fusion/posterolateral lumbar fusions, discectomies and laminectomies), (iv) the efficacy of the various modalities of treatment in relieving the consequences of back injuries and conditions, and (v) what modalities of treatment are appropriate to treat different types of back injuries or conditions, and therefore what modalities of treatment are likely to be utilized to treat various types of back injuries or conditions. I use this specialized knowledge in treating my patients in the non-litigation context and in performing life care planning and rehabilitation consulting services in both the litigation and non-litigation context. I also used this specialized knowledge in formulating my opinions that Benjamin Koenig will require the medical and health care goods and services that are outlined in the supplemental life care cost analysis that Dan Bagwell and I prepared in this case. My specialized knowledge and opinions regarding Benjamin Koenig's probable need for these services will be helpful to the jury in determining what future care he will need.

7.  I have treated many patients who, like Mr. Koenig, suffered from herniated or protruding discs and needed pain management services and back surgery. I regularly evaluate such patients to determine whether they need pain management services (including the types of pain management services I have opined Mr. Koenig will need) or spinal surgery, including anterior lumbar interbody fusion/posterolateral lumbar fusions, lumbar discectomies and laminectomies. I regularly determine that my patients need such services and refer them to specialists in providing such services to receive such services. In almost every case in which I determine a patient needs such services and refer the patient to a specialist, the specialist actually performs the services I have recommended. I work closely with the pain management specialists and surgeons in providing these services to my patients, and ensure that I am aware of the progress that my patients make in receiving these services. The fact that I do not personally perform pain management and surgical services does not mean I do not have the specialized knowledge to determine that, in

reasonable probability, such services are (or will be) medically necessary, that such services are likely to result in improvement of the patient's condition, and that the services will actually be performed.

8. In addition to determining the need for pain management and surgery in my patients and referring them to receive those types of treatment, I have also treated patients (including patients with herniated or protruding discs like Mr. Koenig) after they have received such services. This experience with patients after they have received these services has augmented my specialized knowledge regarding the effectiveness of the various modes of treatment.

9. In my work as a Certified Life Care Planner and a consultant performing independent medical evaluations, I regularly make decisions regarding the necessity of various modes of treatment that I do not actually perform, including pain management services and back surgeries. That is, part of my job is to examine the patient and review his records and make an independent determination regarding whether that patient would benefit from pain management services or surgery, and make recommendations regarding what types of treatment the patient should receive. I am qualified to do so by virtue of my medical education, training, and experience, as well as my education, training, and experience as a certified life care planner. Furthermore, I am familiar with extensive peer-reviewed literature that discusses the available treatment options for individuals with cervical and lumbar injuries, long term complications, and need for revision surgeries resulting from the development of symptomatic adjacent segment disease.

10. I am also qualified to determine whether the injuries and conditions for which Mr. Koenig needs the medical and attendant services set forth in the life care cost analysis were the result of the collision in this case. My education, training and experience has provided me with specialized knowledge of (i) the effects of trauma and degeneration on the human body and the human spine, (ii) the effects of sleep apnea on the human body, and (iii) the effects of various modalities of treatment on conditions and injuries such as those with which Mr. Koenig presented. This specialized knowledge enabled me to review Mr. Koenig's medical records and medical history, examine and interview Mr. Koenig, identify, order and review the results of any testing that was necessary, conduct medical research, and determine the probable cause of the patient's injuries and conditions. I have treated and evaluated many patients who suffered from preexisting conditions such as sleep apnea and who also suffered a traumatic spinal injury. In the course of treating and evaluating these patients, I am able to apply my specialized medical and anatomical knowledge to the circumstances of the case to determine the probable cause of the patient's injuries and conditions. This is important to the treatment decisions I must make, because many times treatment decisions depend, at least in part, on the cause of the injury or condition. Further, in my work as a Certified Life Care Planner and a consultant performing independent medical evaluations, I am frequently called upon to offer an opinion regarding whether the patient's injury or condition was caused by a particular traumatic event, such as an automobile collision or a fall. For example, I have been hired by insurance companies to make such a determination so the insurance company can decide regarding whether a particular claim is covered by the policy.

11. A life care plan or cost analysis is a consistent methodology for analyzing all of the medical and medically related goods and service needs dictated by the onset of an injury or condition through to the end of life expectancy. Consistency means that the methods of analysis remain the

same from case to case and does not mean that the same services are provided to like injuries or conditions. This methodology involves deliberately and methodically collecting, organizing, evaluating, and interpreting patient-specific information to identify the patient's circumstances in order to determine what medical, health care and attendant goods and services are required as a result of the patient's condition and to identify preventative measures that can be applied in an effort to thwart potential medical complications, incongruences in care, inappropriate equipment/supply recommendations, and unrealistic rehabilitation programs.

12. The life care planner has a number of sources of data available, including (i) the patient's medical records; (ii) interviews with the patient and/or his family or care-giver; (iii) medical and psychological testing; (iv) clinical practice guidelines and (vi) published research literature. While it is not always necessary for the life care planner to consult every one of these sources, he should gather as much information as necessary to determine, in reasonable probability, what goods and services the patient will need as a result of his condition or injury.

13. Once the life care planner has gathered the relevant data, he must systematically organize it and then analyze it by utilizing his specialized knowledge and experience. Specifically, he must utilize his specialized knowledge of the physical and psychological consequences of the patient's condition or injuries and the long-term care requirements necessitated by those physical and psychological consequences to determine the goods and services that will likely be needed as a result of the patient's condition. By utilizing the information sources outlined in the previous paragraph and applying his specialized knowledge and expertise, the qualified life care planner can provide a reliable outline of the medical and non-medical goods and services the patient will need as a result of his condition.

14. Of course, the methodology calls for and permits the individual life care planner to exercise his own clinical judgment based on the specific facts and circumstances of the individual case, and the fact that it does so, does not make the methodology unreliable, so long as the life care planner is competent and exercises his judgment within the confines of this methodology. Indeed, a methodology that eliminated the exercise of independent clinical judgment by a competent life care planner would itself be less reliable, because it would not account for the individual circumstances of each case. For this reason, the life care planner's experience and qualifications are a very significant element of the reliability of his plan. Finally, the life care planner can "cost out" the necessary goods and services by researching the cost of such goods and services in the geographic community in which the services will be utilized. Cost data for Mr. Koenig's life care plan were obtained through well recognized and validated databases as well as vendor surveys in the geographic region in which the services are anticipated to be rendered.

15. The foregoing methodology is the methodology that is utilized by life care planners in both the litigation and non-litigation context every day all over the country, which is taught in graduate life care planning programs in American colleges and universities, and which is outlined in published and peer-reviewed texts and articles accepted as reliable in the field.

16. The methodology that Mr. Bagwell and I used to formulate our opinions regarding the medical and health care goods and services that Mr. Koenig will need in the future was identical to the methodology we would use in the non-litigation context, such as when we advise insurance

4

companies regarding an insured's probable future medical needs so they can set reserves or when we advise a patient about his future prognosis. This methodology involves reviewing the patient's medical records and history, interviewing, examining and evaluating the patient, performing any testing that is indicated, conducting case-specific research of the medical literature, applying one's specialized knowledge (including that gained by any case-specific research) to the data to make a prediction of what goods and services Mr. Koenig probably would need, and researching in well-accepted and reliable databases the reasonable, usual and customary price for such goods and services in the geographic area where he will likely receive them. This is a published, well accepted, reliable methodology that is used by life care planners every day in both the litigation and non-litigation context. Although one step in this methodology was to apply my specialized knowledge gained through my education and experience in medicine and life care planning to the underlying data, the development of a life care plan is not purely subjective. Instead, it is the result of the application of a testable methodology, in that another physician or life care planner could examine the same underlying data that I examined and apply his own clinical judgment to determine whether he agrees or disagrees with me, and would have adequate data and information about my analysis to make that independent assessment. Additionally, the collaborative approach taken by Rehabilitation Professional Consultants (in which more than one professional participates in the formulation of the life care cost analysis) mitigates the risk of error due to subjectivity. In Mr. Koenig's case, Mr. Bagwell and I concurred in the life care cost analysis, thus reducing the risk of error due to subjectivity.

17.     I follow this same methodology in the litigation and non-litigation context, and followed this methodology in developing my opinions in this case. Specifically, I gathered Mr. Koenig's relevant medical records, and worked with Mr. Bagwell and our staff to systematically review and organize them, and then reviewed them carefully myself to determine Mr. Koenig's physical condition, illnesses and injuries; the medical care he had previously received for those illnesses and injuries; the progress he had made in light of his past medical care and treatment; the probable causes of his physical condition and those injuries; any anticipated changes in his treatment; any anticipated onset of complications; any issues in management related to his behavior; any family dynamics or behavioral issues; and any other information that may be meaningful to me in determining his future needs. Mr. Bagwell and I performed a detailed clinical interview and examination with Mr. Koenig. Mr. Bagwell and I performed research into the applicable medical literature to inform our opinions. This research ensures that we are addressing all the issues that need to be addressed in light of the patient's condition and points us to any additional information we need to seek. In analyzing the data and formulating my opinions, I applied my expertise in medicine, anatomy and life care planning, the medical and non-medical aspects of disability, the rehabilitation aspects of disability and health care conditions, the long-term psychological impact of these conditions, the long-term care and support necessitated by these conditions, and case management. In determining the cost of the treatment modalities included in the life care plan, I accounted for the geographical location in which Mr. Koenig would be receiving the goods or services, and provided the average cost for these services in those locations. I also relied upon data from Truven Health Analytics, which is thorough when evaluating usual and customary charges. Truven Health Analytics looked at 51,822 hospital admissions to determine what a customary cost would be for an anterior/posterior lumbar fusion with fixation with an average length of stay for three days of hospitalization.

18. The application of this methodology in this case yielded a reliable life care cost analysis for Mr. Koenig. The medical records, clinical interview, medical literature, and my specialized knowledge of the types of goods and services generally needed by patients with injuries and illnesses similar to Mr. Koenig and the effect that these injuries and illnesses have on a patient's capabilities and capacity to perform the activities of daily living supported the recommendations we made in our life care cost analysis in this case. We would have approached this life care plans in the same way and utilized the same methodology had this case been in the non-litigation context, such as if a treating physician, insurance company or hospital had requested that we develop a life care cost analysis for Mr. Koenig.

19. Our life-care plan includes one category of future care needs that we have characterized as 'potential care needs'. These are items for which there is a substantial possibility that they will be needed in the future, but do not yet meet the threshold of "more likely than not". For this reason, these potential care needs and associated costs have been clearly segregated from the projected costs and excluded from the grand total costs. The purpose of including a separate potential care needs category is so that the jury will know that, based upon the information we currently have, there is a significant possibility that Mr. Koenig will ultimately need these services.

21. My opinion that Mr. Koenig, will more likely than not, require an anterior lumbar interbody fusion/posterolateral lumbar fusion, will need pain management services, will need a subsequent extension procedure of his fusion and the other goods and services outlined in the life care cost analysis as a result of the collision was based on the facts that (i) Mr. Koenig did not suffer from significant back pain prior to the collision, (ii) his post-collision MRI indicated at L5-S1 a 4.0 mm subligamentous disc herniation abutting the S1 nerve root sleeves bilaterally, (iii) he began suffering lower back pain with a radicular component after the collision, (iv) his post-collision symptomology was consistent with the bulging or herniated disc pressing on the nerve root, and (v) Mr. Koenig had not made substantial improvement in the several years since the collision despite receiving a great deal of conservative treatment, including medications, physical therapy and epidural steroid injections. Applying my specialized knowledge outlined above, and in conjunction with Dan Bagwell, who also has extensive experience treating and managing the care of persons with similar injuries, I determined that, in reasonable probability, Mr. Koenig (i) needs back surgery, (ii) will undergo back surgery in the near future, (iii) would benefit from back surgery, (iv) will need additional pain management services, (v) will receive additional pain management services in the future, (vi) would benefit from additional pain management services in the future, (vii) will need a subsequent extension procedure of his fusion secondary to the statistically likely probability that he will develop symptomatic adjacent segment disease within the next twenty years and (viii) needs or will need the diagnostic services, equipment, supplies and essential services outlined in the life care cost analysis. Although Mr. Koenig appears to have some mild bilateral foraminal narrowing, which is probably unrelated to the collision, he was essentially asymptomatic (i.e., he did not suffer any significant or consistent back pain) prior to the collision, but developed back pain with radiation in the lower extremity after the collision. Given his history and his course of treatment, I concluded that it is more likely than not that disc herniation or protrusion, and back pain, as well as his need for future surgeries, pain management services, and the other goods and services outlined in the life care cost analysis were the result of the collision, rather than any preexisting conditions."

_____
David Altman, M.D.

SWORN TO AND SUBSCRIBED before me on this 17th day January, 2017.

_____
Notary Public, State of Texas

My commission expires:

GINA L PEAK
Notary ID # 129190061
My Commission Expires
November 2, 2020

7

EXHIBIT "1"